and was kept under consideration until this term, when the opinion of the court was delivered by
Butler, J.
There should be great caution observed, in relation to cases like the present. The court should only take cognizance of such matters as may fairly come within the scope of a judicial judgment. Prom his habits of thinking and education, a judicial magistrate is'not very well qualified to give a definite and enforcible judgment on questions of Theological doctrine, depending on speculative faith, or ecclesiastical rites-. It is to be regretted that they have of late become such frequent themes of forensic discussion. In all religious societies, difficulties will exist— and when they cannot be settled by a corporate forum, they are very rarely cognizable before a civil tribunal. I mean questions merely of a religious character.
From the view which has been taken of the case before the court, it has been relieved from the consideration of any other questions than such as assume a strictly legal character — questions that depend on the construction of written instruments. The charter of every corporation constitutes its fundamental law; all subordinate regulations, in the form of by-laws, must be in conformity to it. .By-Jaws thus made constitute the statutes for its immediate and peculiar government. When they are made by proper authority, the members of a corporation are under a legal, as well as a moral obligation, to observe them. When their provisions are either disregarded or violated, cases may be presented for the interposition of judicial authority. The general presumption is, that a corporation itself can enact and enforce sufficient sanctions for the purpose of securing obedience to its laws. When it loses the capacity of self-government, by disorganization, or partial usurpation of some parts over others, the parties injured by such abuses, may well ask for the aid of the civil magistrate. In such cases, the by-laws as well as the charter, must be looked to as rules of conduct. Questions like these most generally arise in the following instances. Have the corporators themselves, by open avowal, or *269 unanimous consent, assumed a new jurisdiction, or perverted the charter from its original design 'l Or have they, in the administration of their government, for the time being, conducted themselves without regard to the provisions of subsisting by-laws, to the prejudice of individual members or officers ? In the first point of view, the case might occur in which the State might demand a surrender of the charter, under a judicial judgment of forfeiture. For instance, if this corporation, which was incorporated under a Legislative guarantee, that it should exist and. continue as a Jewish Synagogue, were to be converted into a Turkish Mosque, or were to assume 'any other religious character, palpably different from that claimed for it by its founders, its charter might be taken away from it, or it might be chartered under another name. Or, in another view, if a majority of the congregation were to exclude the minority from the acknowledged worship, peculiar to the sect of Israelites, this minority might well claim to be restored to a situation in which they could enjoy their rights. In the cafees supposed, the conduct of the parties would be evinced by open professions, or by some palpable exhibition of their determination and designs. There are other cases again, in which an integral part of a corporation would not be allowed to usurp powers given to other departments of corporate government. Or, where one integral part has been excluded from the performance of its functions, by the. combination or usurpation of other parts. Besides these, individual rights, growing out of the operation of the by-laws, may present questions for legal adjudication. Disputes in reference to such matters, particularly the latter, have not been unfrequent in the English courts. They have generally arisen in cases of election or amotion, and when one or the other of these may have been affected, either by improper authority, or in violation of legal by-laws, jurisdiction has been taken, and redress given. In such cases, there have been, sometimes, difficulties in respect to usages that should stand in the place of law, or to ascertain, in fact, what,were the laws by which the corporation should be governed. They have been contests for the enforcement of recognized *270 rights and established franchises — and, like all legal rights, they were made to depend on the application or construction of law. The motives of the parties, or the differences merely of a mental nature, do not .seem to have had anything to do with the decisions of the courts.
It is almost impossible to reduce matters growing out of a difference of opinion, to such a definite form as to subject them to judicial cognizance. Rights and franchises are such matters as have legal existence, and may be protected by law.
Speculative disputes must be left, in some measure, to the arbitrament of opinion. To suppose that an uninterrupted harmony of sentiment can be preserved under the guarantee of written laws and constitutions, or by the application of judicial authority, would be to make a calculation that has teen refuted by the history of all institutions, like that before us. Neither is it practicable to frame laws in such a way as to make them, by their arbitrary and controlling influence, preserve, in perpetuity, the primitive identity of social and religious institutions.
The granite promontory in the deep may stand firm and unchanged amidst the waves and storms that'beat upon it, but human institutions cannot withstand the agitations of free, active, and progressive opinion. Whilst laws are stationary, things are progressive. Any system of laws that should be made without the principle of ex-pansibility, that would, in some measure, accommodate them to the progression of events, would have within it the seeds of mischief and violence. When the great Spartan law-giver gave his countrymen laws, with an injunction never to change them, he was a great violator of law himself. For all laws, however wise, cannot be subjected to Procrustian limitations. Cesante ratione cessat lex, is a profound and philosophical principle of the law. These remarks are more particularly true, in reference to matters of taste and form. Let the oldest member of any civil or religious corporation, look back and see, if he can, in any instance, trace the original identity of his institution, throughout its entire history. Those who now, in the case before us, insist with most earnestness on a se *271 vere observance of ancient rites and forms, would hardly recognize or understand the same, as they were practiced by their remote ancestors who founded the Synagogue. The Minhog Sephardim, was a ritual of Spanish origin— and although it may yet obtain in different countries, yet how differently is it observed. If two Jewish congregations, one from Poland, and the other from Spain, were to be brought together, whilst professing to be governed by the same rituals, they would probably find themselves unable to understand each other in their observances of them.
The Jews in every part of the world, by whatever forms they may be governed, could, no doubt, recognize the general spirit and prevailing principles of their religion, to be essentially the same. But in mere form, a resemblance could not be' traced with anything like tolerable uniformity.
As practiced and observed in Charleston in 1784, and for many years afterwards, exercises in Spanish were connected with it. They have been long since discontinued; long before the commencement of this controversy. Religious rituals merely, not involving always essential principles of faith, will be modified, to some extent, by the influence of the political institutions of the countries in which they are practiced. In a despotism, where toleration is a sin to the prevailing religion, religious exercises will be conducted in secret, or in occult forms. Faith and doctrine may take refuge in these for safety. On the contrary, in a country where toleration is not only allowed, but where perfect freedom of conscience is guaranteed by constitutional provision, such devices will not be resorted to. Language, itself, is continually undergoing changes ; clumsy expressions of rude language will give way to modern refinement. There are those in every church who would be shocked at the change of expression in respect to the tablets or books that contain the prayers and more solemn forms of religious rituals. At this time, there are many who oppose any change of style in the editions of the Bible. It is not surprising that those who have been accustomed to one form of expression, should have *272 associations with it, that they could not have with another. And it is so of all religious forms and ceremonies. The feelings of such persons should never be treated with indifference or rudeness. . They deserve respect, and are to be regarded as useful checks on reckless innovation. Matters of this kind must necessarily belong, and should be committed, to the jurisdiction of the body that has the right of conducting the religious concerns of ecclesiastical corporations. Charters are granted to such corporations, upon the ground that they can carry out their ends with greater efficiency than if they were left to individual exertions, and the operation of the general laws of the land. The parties before us who are opposed to reform, contend that dangerous changes have been made in the form of their worship, particularly as it respects the introduction of instrumental music. It is not pretended but that the organ, the instrument complained of, was introduced by the constituted authorities ■ but the ground taken is, that this authority has been exercised to do that which is against the provisions of the charter, which guarantees that the Minhog Sephardim should be a ritual of the congregation, and that it did not allow of instrumental music as a part of it. The objection is to the mere form in which music is used and practiced in this congregation. I suppose it might be admitted, that in its origin, such a ritual was practiced without the aid of instrumental accompaniment — but to suppose that the exact kind of music that was to be used in all future time, had been fixed and agreed upon by the Jewish worshipers who obtained this charter, would be to attribute to them an impracticable undertaking. That such music was not used, is certain but that it might not, in. the progress of human events, be adopted, would be an attempt to anticipate the decision of posterity, on matters that must be affected by the progress of art, and the general tone of society — and which could not be controlled by arbitrary limitation. As this was a subject that could not be well reached, much less continually controlled, by the judgment of this court, we think the judge below very properly excluded all evidence in relation to it. Evidence was offered on a graver *273 subject, touching the faith and religious professions of the majority that introduced and established the organ. It might be sufficient to say, that the party which has been charged with heterodoxy, in this respect, profess to adhere to the ancient faith of the Jews. They do not occupy the position of those who openly disavow the faith of the founders of the Synagogue. If they were to do so, it would be time for the court to say how far it would take cognizance of the rights of the minority, under the terms of their charter. How can a court ascertain the faith of others, except by their professions ? Gan it be done by the opinions of others, and if so, by whose opinions ? It is said that no two eyes can see exactly at the same distance ; and perhaps no two minds have exactly the same conceptions of the same subjects, particularly of matters of faith and orthodoxy. ' The unexpressed sentiments of the human mind are hard to be found out, and it is a delicate office to assume a jurisdiction over its operations, when they are to be reached by the opinions of others, or conjectural inference. Expressions and acts may give tolerable information, upon which the judgment may act and determine.
In this case suppose the Judge below had opened the enquiry as to the faith and doctrines of the dominant party, where would he have looked for information ? Surely not to the minority, or any others who might occupy an adversary position. Could he have trusted to the testimony that might have been procured and given from other sects and denominations of Jews in other countries ? and if so, should he have consulted those who live in Palestine, in Germany, in England, or in the United States ? He might have assumed the power to do this, but it would have been a wilderness of power, with scarcely a compass to guide him. It would have been to go into the labyrinth of curious and recondite learning, without a clue by which he could escape from its bewildering perplexities. He would have had another difficulty, that is, to determine whose testimony he would have taken, for both parties, no doubt, had ready and able advocates for their respective doctrines. It seems to me it would have been hard for a civil magis *274 trate to give a definite, much less a satisfactory, judgment on such subjects. We, therefore, concur in the propriety of the course pursued by the Judge below in respect to these matters. If the court can be called on to settle by its decision such disputes, it would be bound to require parties to conform to its standard of faith — a judicial standard for theological orthodoxy ! — Having made these remarks, rather by way of general explanation, than as authoritative adjudication, I will proceed to state the more definite questions of a legal character upon which the judgment of the court will be made to turn.
These questions respect the resignation of twenty-two of the respondents, and the readmission, or election, of themselves and twenty-three others. Twenty-two had been members of the congregation, and had a right to all the privileges and immunities of the corporation.
The first question, then, is, had they at any time and by any act voluntarily surrendered their right of membership, by doing that which would, in the opinion of this court, amount to a legal resignation 1
And secondly- — if so, were they re-admitted by the exercise of lawful' authority 'l — and in connection with this, proposition will be considered the rights of the other twenty-three who claim to have been elected members at the same time.
1st. It will be necessary to look for a moment at the nature of the interest of the original corporators whose resignation is in question. Did their rights depend on membership % — or were they such that they could not be deprived of them except by written alienation o.r surrender'? It was suggested in argument, that having contributed their money to buy a burial ground and erect a building as a place of worship, they had something like a right of property in the corporate fixtures and lands. This is placing them in the position of tenants in common in an estate, rather than as members of a religious institution. Although they were members of a private corporation to which they had contributed their private funds, it must always be borne in mind that it was an association instituted for religious purposes. They were admitted under *275 law, and could be regulated and removed according to laws Their tenure must be referrable to the terms of the law, if they can show no independent right depending on purchase. — The duration of their membership in this point of view would seem to limit their right. The character as well as appellation of private corporations are known according to the objects for which they are created. One of the views of such a Society in obtaining a charter, is for the purpose of managing, with greater facility and advantage, the temporalities belonging to such a body. The great object, however, is the privilege of having a self-government in respect to the end in view of the corpora-tors. The enjoyment of the temporalities is incident to the tenure of membership, and cannot be claimed as a right in the nature of a legal interest in property. By way of illustration, suppose a member to be excluded from the congregation by amotion legally conducted and effected under the by-laws — could he still insist on claiming his seat as a voter or Yehid, or could he insist on other privileges which had been enjoyed in common with others ? If -he could, it must be in virtue of some definite right which he had bought from the corporation as such. I have no doubt that a right to a place of burial could be acquired by individual purchase, and it is one which ought to be conceded by the corporation to all such who are disposed to claim it. Such interests as these, however, have not been presented to us, and are, therefore, not the subject of any distinct adjudication. To have certain legal rights by virtue of title from the corporation is very different from, claiming the privileges now in question. The respondents claim the right to vote and take a part in the deliberations of the congregation — they claim a right of off fice as individual members under the charter of a private religious institution.
I think there can be no doubt but that such a right may be parted with by voluntary resignation. The question is whether such a resignation has been made and accepted according to law, and in a way to be obligatory on all the parties to this controversy. To make it so, there must have been both a resignation, cum animo, and an acceptance of *276 it on the part of the acting and responsible government at the time. — No overt act of resignation in writing or deed was ever made. If it ever took place, it was to be implied from acts and conduct, both in reference to the then existing Constitution (that of 1837,) and the general principles of law. It was suggested in argument that the motives of the seceders in leaving the congregation were not to give up their membership, but to manifest their indignant displeasure at what they regarded irreligious innovations, and with a view of arousing attention on this subject. Whatever may have been their purpose must be judged of by their acts, and the presiding Judge left this as a question of fact to be determined by the jury. If the act of resignation could be completed by parol only, the course of the judge was entirely correct, and the verdict of the jury should settle the question. Then the question occurs, can an office or right of membership in a corporation be surrendered by parol?
That resignation may take place by parol, and may be implied from the acts of the parties, seems to be pretty well established by authority. In the case of Rex vs. Rippon, 1 Lord Ray. 563, the question was much discussed, and it was held that an alderman, by a verbal declaration, and withdrawing at the time from the Council room, had resigned his office, and that it had been accepted by the election of another. I will save myself the trouble of reciting the language of the different authorities on the point, and will only cite the books in which they may be found. 2 Sal. 443 ; Angelí and Ames, 254, 255, 256 ; Wilcock, 238, 239, 240; 2 Kyd. 450. These authorities recognise the necessity of acceptance to make the act of resignation entirely obligatory. The different acts of the parties touching this point were fully brought to the view of the jury by the presiding Judge. At the time the respondents left the congregation (in the summer of 1840,) the Constitution of 1840 was not adopted — and therefore, the provision of that instrument requiring resignation to be made by letter, was not of force. The respondents acted under the Constitution of 1837, or must have felt themselves bound by the general laws of the land. The 12th article *277 of that Constitution contains an inhibition against all Is-raelites from combining to erect another Synagogue within five miles of Charleston, under the penalty of “their being deprived of becoming, or remaining, members of the Synagogue.” In defiance of this provision, after the organ was erected, the respondents, whose resignation I am now considering, seceded, and joined themselves with some other Israelites into a distinct society called “Sheareet Israel.” This body had a separate place of meeting, made arrangements to build another Synagogue, ceased to attend corporate meetings, and made no contributions. They did not claim to be members, but as strangers applied to be admitted under the authority of the then existing government. In all this the corporation and trustees acquiesced. They did not summon the defendants to attend meetings, neither exacted of them fines or subscriptions, nor in any manner did they treat them as members. A new Constitution was formed (a very important measure, and one in which all the members interested in the fate of the institution might be supposed to have a deep concern.) If they had considered themselves as members they should have been present to resist dangerous changes, if any had been proposed, and this ought to have been their course if they intended to continue their relation to the Society, and to take a responsible part in its deliberations. They did not attend, nor were they summoned to attend. This will go to shew that they had ceased to perform the duties of regular members, and that those who remained in the government of the corporation had ceased to regard them as voting corporators. There seems to have been a mutual understanding as to the relation of the respondents — ■ they acted as though they were not members, and the other party treated them in like manner. Prom this it might well have been concluded that resignation had been made on one part, and acceptance on the other. But finally, the respondents applied for re-admission. Why did they do so, if they regarded themselves as temporary seceders cum animo revertendi 7 This application was a practical commentary on their previous understanding, , and amounts to recognition of their surrender of corporate *278 privileges incident to membership. Ex parte Gray, Bail. Eq. 77) Hunt vs. Elliott, Ib. 90. For three years' the defendants refused to perform the duties of members, and during that time the other party treated them as strangers. Can it be well supposed, then, that the defendants, during the whole of that time, acted upon the consciousness of reserved and enforceable rights 7 Taking all these facts together, I think the jury were well authorised to come to the conclusion that is evinced by their verdict.
The second question brings up very important matters for consideration; and requires the court to look into the original character of the government of this corporation as it is prescribed by the charter, and into its organization as it is regulated by the by-laws. The charter is the fundamental law, and the by-laws must be looked to for the purpose of ascertaining the mode of existence or the manner of administering the corporate government under the law of its creation.
By the 2d. clause of the charter, the corporation has a right to hold lands, and so forth — to make such rules and by-laws for the rule and government of the same, and for the election of members, and so forth — -to appropriate money for the support of children, and so forth, “as shall be, from time to time, agreed upon by the adjunta of said corporation, or meeting of the Elders thereof, chosen by the said corporation^ By the 3d. clause, the corporation has a right to hold personal estate, and to appropriate the funds arising therefrom, “ in such manner as may be determined by the said adjunta or Elders of the corporation, and to appoint and choose and displace and remove, and to supply such ministers, officers, (fee. and to appoint such salaries for their labor and services out of the funds thereof, as the said corporation shall, from time to time, approve and think fit.”
Now, here it is clear that the power to create all the departments of corporate government, with the ultimate right of remodeling it, or removing officers, is given to the corporation at large; with this qualification, (clumsily expressed) that the by-laws are to be made and. submitted to the adjunta for their approval. Before the adjunta *279 could exercise this office of approval, they had to be brought into existence by the choice of the corporation. When once created, that body formed a part of an organ-ised government, and may have had the power of approval or veto quoad the subjects submitted to them. The power of creation and amotion is clearly reserved to the corporation itself. Under any construction that can be given, the adjunta was not an independent integral part of the corporate government to do any other acts than such as ■were committed to its limited authority. By the terms of the charter, it was pre-supposed to be a necessary and important department of government. But the original power of making by-laws, or the power of electing officers, was not given to it. Whether these powers might not have been given to it by the legislative consent of the whole, I shall not now undertake to determine. It never has, as far as we know, undertaken the exclusive authority of legislation; and if it possesses, or ever possessed, the power of electing officers or members, it must be in virtue of by-laws that have conferred upon it such powers. The mode of exercising its powers must, therefore, be traced to the by-laws which have been adopted under the sanction, of its approval. These by-laws, or constitutions, as they are termed, must prescribe a rule of conduct, as well for themselves, as for all the members of the corporate body. For if a charter has described the mode in which by-laws shall be made and adopted in order to their validity, that mode has been pursued, that is, supposing the adjunta spoken of in the charter to be the same as the trustees that are recognised and appointed under the Constitutions of 1837 and 1840. Here it may be observed in passing, that from the circumstance that there is now a doubt as to who were the adjunta under the charter, we cannot be certain of many matters connected with the original history of the Synagogue, either as it respects its secular government, or its religious rituals. But I will assume, what was rather conceded in argument, that the Board of Trustees answer, in character, to the original adjunta spoken of in the charter. If so, that body, under the bylaws, had only derivitive existence and qualified functions, *280 and could only do business under the authority that surrounds it. The great question is, how can it assume an organised existence for the purpose of exercising its conceded functions 1 Can that be done in a manner different from that strictly prescribed in the Constitutions ?
Human wisdom is shewn in nothing more strongly than when reason and deliberation, by previous laws, have interposed restraints on the excesses of passion, or have interposed guards against the dangers of irregularity and precipitation. All well digested codes of laws are framed in reference to these ends. That system of government, whether of a private corporation, or of an empire, that has but one single independent department, that may move by its own spontaneous action, and which requires no concurrence with another, has within it either the principles of an irresponsible despotism, or it is one that will be driven from one extreme to another by the wild impulses of caprice and tumult. A subordination and concurrence of action afford, by the delays which they occasion, and by the forms that must be observed, some security against the dangers of irregularity and precipitation. If all will act in obedience to previous law, they will avoid the temptations of sudden excitement, and will only do what they agreed should be done when reason and concord were their counsellors. I will now proceed to the enquiry as to what powers have been conferred on the different functionaries of this corporation by their constitutions. When no definite class has original authority under a charter, the powers of government reside in the body at large. Ang. & A. 178.
The power of making by-laws as rules of prominent government, was given by the charter to the entire body of the responsible corporators in the case before us ; and that has never been parted with by any by-law conferring it on any definite class. The general provisions of the constitution are, that after the trustees have been chosen, they shall have the powers therein enumerated, (all of which are essentially administrative or judicial) with, perhaps, these exceptions, that of appointing a Parnass, and electing or receiving new members. These latter powers are *281 those which are mostly concerned in this controversy. The power of electing a President is more instrumental than original, for when the President is appointed, he is invested with authority, not under the trustees, hut under the constitution. He is a constitutional officer appointed by one of the departments of government. But once he gets his appointment, he is required to exercise, exclusively, many important functions upon his independent responsibility — without the control of, or co-operation with, any one else. In the creation of the different officers, the process is from the body at large, through the Board of Trustees, to the Parnass. But, for the purposes of organization, the order is inverted, and the Parnass is the efficient agent for bringing into activity and official form the other powers. He is the nucleus of organization. According to the mode prescribed, he, and he alone, is to summon the trustees, and when assembled under his summons, he presides over, and, for some purposes, forms a part of them.
Without being summoned together, the Board, as individuals, have no official authority, nor have they any original authority at all, either under the charter or the by-laws. As a body, it is the creature of legislative enactment or corporate appointment, and as such, must be bound by the mode of proceeding implied or expressed in their appointment. If they were to assemble by the call of their president, or in any other way than that definitely provided for, and were to undertake by legislation to give themselves power, it would be a usurpation, and all acts done under such an exercise of authority would be void. Ang. & A. 199. 4 Burrow, 2190.
So, too, all elections that may have taken place under such authority, upon an implied acquiescence of other parts of the corporation, would be illegal. To do any thing, they must shew their authority by express grant. How then do the trustees get their power to elect ? Why, in the same way that they get their power to assemble. They could not do either the one or the other, without delegated authority. I shall not enquire here whether the power delegated to that body, of electing members, or' for any *282 other purpose specified, was repugnant to the charter. It may be conceded that the corporation, having the original power, had a right to have it exercised in such manner as they might, think proper. Let it be conceded, then, that, by the constitution of 1840, the trustees have the right to elect members. How are they to proceed to go into an election? If a majority were to assemble without summoning the others, it would be an illegal assembly for any purpose, either for that of administration or election. By their own agreement, under the by-laws, they have subjected themselves to the power of the President, so far as regards their assuming the form of official organization. The power of the President is distinguishable from his duty. He has the power to call the Board together as often as he may think proper. It is his duty to do so once a month, or on the application of three members of the Board. He is the executive organ to do this, like many other acts conferred upon him, or incident to his office. On failure to perform his duty, can one member take his place of issuing the summons ? If one could not, could two or three do it ? Ordinarily, it is conceded, this could not be done, and where the President is willing to perform his duties, it would follow that the trustees had no right to assemble on their own accord. But the ground taken is, that although they cannot supercede the power of the President when he is willing to exercise it, they may assemble, and be a legal body, in spite of the President, on his refusal to call them together in the manner pointed out in the Constitution. The assumption is to transfer to the Board itself, by its own spontaneous action, the power of the President in the contingency supposed. This assumption is the hinge of the case. The re-admission of the twenty-two who had resigned, and the original admission of the other twenty-three, depends on this narrow proposition, whether the meeting of the Board of Trustees on the 6th of May, 1843, was legal or not. That meeting was not, in fact, called by the constitutional officer, but was brought about by the trustees themselves. The difference between such a meeting as this and one called on the authority of the President, is very obvious. *283 A meeting called by the President would be obligatory on all, whether present or absent, because all hare agreed to the legality of such a meeting in the solemn form of law. That being known to all, would be obligatory on every one. And at a time of great excitement, requiring the best counsel of the constituted authorities, a meeting called by the President would have been attended by all the trustees ; whilst that called by the trustees themselves might be secretly convened, and might consist of only those who were of the same opinion or the same way of thinking. In such a meeting, there would not likely be any thing like a discussion favorable to any but previous determination.
It seems that the President refused to call the Trustees together, on the application of the requisite number, in consequence of certain resolutions ode red by Mr. Cardozo, on the 2d May, 1843. It is not my province, as a magistrate, to question the motives of the mover of these resolutions, or to arraign the good faith of the President in obeying them. I do not regard the resolutions as imposing the obligations of a constitutional by-law, nor such as' would repeal former by-laws having the character of constitutional provisions. They were adopted in full assembly, and by the legislative body of the corporators, but that body not being summoned for. constitutional purposes, had at the time no right to assume a jurisdiction beyond the objects for which it was summoned together. In this respect, it was a good meeting for limited purposes. Although the resolutions may not have had the obligation of constitutional authority, they may, nevertheless, be regarded by the President as containing imposing instructions as to his duty. They seem to have been regarded by him as a virtual suspension of his authority to call a meeting of the trustees. The question again recurs, could there be a regular and legal meeting of the trustees without the call of the President? All corporate powers, especially such as are conferred on a select body, must be strictly pursued, and in nothing so much as in the manner of assembling to do business. — Rex vs. Head, 4 Bur. 2515; Ang. and A. 178, 179. To render the acts of such a body *284 valid, not only notice must be given, but the authority must be by some one authorized to assemble the body. An election to fill the vacancy of an Alderman, without the summons of the Mayor, is void. — Machell vs. Nevinson, 2 Lord Ray. 1357. In that case the Common Council had met as by accident, and had proceeded to an election. It was held void; because the summons for the purpose had not been duly made by the Mayor. — Ang. and A. 276; Kyd, 432; 11 Bast, 84. These authorities go to shew the strictness of the English Courts, in their judgments upon such cases. In one of the cases on this subject— that in 4 Burrow, 2204 — the corporation consisted of a Mayor, Jurats, and Common Council. The jurats had the power, after they were chosen, to elect one of their number to act as mayor. Now, in a body thus constituted, there could be no meeting without the summons of the mayor.
But it is contended, and contended with great force, that in the case before the Court, the President was not, like the Mayor, an integral part of the corporation. It seems to me quoad the powers vested in him, he had an independent authority. Both constitutions recognise him as an important executive officer, who is required to act, on many important occasions, upon the dictates of his own judgment, without the concurrence of any one else, and in calling together the trustees, no one else had any substantive power but himself. A portion of the trustees might exercise, by their application under the constitution, an advisory power, which, it is pre-supposed, should be yielded to on his part; but it is not absolutely imperative, nor does it exist in such a form as to be capable of enforcement by the exercise of any power under the law. If there had been a particular day named, in the by-laws, for the meeting of the trustees, a meeting by them would have been valid without the summons or presence of the President. No time being prescribed, all meetings must be had by the authority of the executive officer or his legal substitute.
The conclusions to which I have arrived, from general authority as well as the construction of the by-laws, may *285 be thus stated. The charter does not give the election of members to the trustees. If they have that power, it is vested in them by the constitution of 1840 ; but the same instrument provides that they shall not meet for that or any other purpose unless convened by the President. Their meeting having been effected without the authority of the President, its proceedings must be held illegal and void. The defendants deri ve their rights of membership from the acts of this body, or the acts of subsequent assemblies that trace their authority to it. The subsequent meetings of the Yehedim cannot sanctify what was already illegal. A derivative right cannot be better than the origin whence it proceeds. Where the base is deficient, the superstructure cannot, mend it.
Let it not be understood, or in anywise inferred, that it is my design to throw any moral blame on the conduct of the four trustees who brought about the election of the defendants. I have every reason to believe that they were engaged in an honest struggle, to carry out plans for the preservation of what they regarded their ancient faith and forms of worship. They have many claims upon the toleration and respect of the dominant party. In matters not really essential, concession would seem to be a becoming course of conduct.
It was said in argument (and it should be here remarked that this case has been argued with uncommon learning and ability,) is it reasonable that a single individual, like the President, shall stop the whole operation of the corporate government, as it should be exercised in contemplation of the constitution 1 Suffice it to say, that I feel bound to be governed by its literal and expressed provi-vions.
The greatest of the ancient republics could be arrested in its legislation, and most important undertakings, by the veto of a single officer. In the midst of peril and excitement, it was the duty of the Tribune to remain cool; and the people felt that there was safety in the fulfilment of this conservative trust. Such a power, in some form, seems necessary in the construction of all well organized corporations. Whether it has been wisely or unwisely ex *286 ercised in the case under consideration, it is not my province to determine.
-From the views which have been taken, the motion to set aside the decision below is refused by a majority of this Court.
O’Neaix, Evans and Wabdlaw, JJ. concurred.